**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BRYAN MCDANIEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:11CV00793 AGF |
| | ) | |
| DAVE DORMIRE, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on the petition of Missouri state prisoner Bryan

McDaniel for a writ of habeas corpus pursuant to 28 U.S.C. ' 2254. A jury convicted

Petitioner of first-degree trespass, Class B first-degree assault, armed criminal action, and

attempted burglary. He was sentenced to imprisonment of one year, ten years, three

years, and seven years, respectively, with all sentences to run concurrently except for the

three year sentence that was to run consecutively, for a total sentence of 13 years.

For federal habeas relief, Petitioner claims that there was insufficient evidence to

support the conviction of first-degree assault; that Petitioner was denied a fair trial due to

the prosecutor's reference to Petitioner during closing argument as "tattoo man," and the

prosecutor's repeated references to Petitioner's use of the word "nigger" during the

commission of the crimes; that defense counsel was ineffective for failing to object to

several racially-related comments by the prosecutor in closing argument, failing to object

to the prosecutor's repeated use of the word "nigger," failing to object to the prosecutor's

characterization, in opening argument, of Petitioner's crimes as hate crimes, and failing

to investigate the crime scene adequately; and that the state postconviction motion court deprived Petitioner of due process by adopting the State's proposed findings of fact and conclusions of law verbatim and without giving Petitioner a chance to submit proposed findings and conclusions.

Respondent argues that habeas relief should be denied because Petitioner's claims concerning the "tattoo man" comment and defense counsel's failure to object to the prosecutor's characterization of the crimes as hate crimes were procedurally defaulted, and in any event fail on the merits, and the state courts' adjudication of the remaining claims was factually and legally reasonable. For the reasons set forth below, habeas relief shall be denied.

## BACKGROUND

### Information and Trial

In charging the offense of first-degree assault, the amended information stated, in relevant part, that Petitioner, armed with a rifle that was loaded and ready to fire, "while yelling nigger," threatened to kill Adrian Hudson (who is African American). Before the jury was brought into the courtroom, defense counsel asked that the word "nigger" be stricken from the amended information as it was inflammatory. The trial court agreed, noting that Petitioner was not charged with a hate crime, and ordered the word stricken. During opening argument, the prosecutor stated, without objection by defense counsel, that during commission of the crimes, Petitioner "said 'I'm going to kill you nigger.' He didn't say it once, he said it twice, he said it repeatedly while they heard. But our evidence will show you that these were more than just hateful words of racism spewing

from the mouth of a bigot."  (Resp. Ex. A at 122.)   The prosecutor also said in opening

argument, "This isn't Birmingham in the 1960s, this is St. Charles, Missouri," to which

the trial court sustained Petitioner's objection.  *Id*. at 126-27.

The Missouri Court of Appeals summarized the evidence at trial, viewed in the

light most favorable to the verdict, as follows:

> On September 20, 2005, [Petitioner] [who is white] rang the doorbell
> of one of his apartment building neighbors, Adrian Hudson, who resided
> there with his girlfriend, Cindy Green, their 10-month old baby, and
> Cindy's sister, Jazimine.  Hudson opened the door, and [Petitioner], holding
> out a handful of paper trash, complained that Jazimine had littered on or
> near the complex.  Hudson denied that the litter belonged to anyone in his
> unit.  The discussion escalated between the two, standing there in the
> threshold of the apartment.  Papers were thrown and kicked, Hudson's shoe
> came off, [Petitioner] hit Hudson in the face with it, and Hudson swiped at
> [Petitioner] with a knife, cutting [Petitioner]'s hand.  Hudson and Green
> eventually managed to close and lock the door.
>
> [Petitioner] disappeared briefly, returned with a fully-loaded semi-
> automatic assault rifle, cocked it with the safety off, his finger on the
> trigger, and began yelling infinite variations on the theme, "I'm going to get
> you, nigger! I'm going to kill you, nigger! Fuck you, nigger! You're dead!"
> [Petitioner] kicked on the door hard enough to shake the walls and pass
> light through the doorframe.  He punched the door hard enough to break his
> own hand.  Hudson and Green braced the door with a chair and called 911.
> A neighbor [Joseph Twehous] likened [Petitioner]'s actions to that of a
> SWAT team attempting to breach an entryway.  That same neighbor also
> called 911 and later testified, "I thought I was going to witness a murder."
>
> At some point [Petitioner] placed his weapon against a nearby
> banister.  He explained during cross-examination that he couldn't hold the
> gun and pound on the door at the same time. When the police arrived,
> [Petitioner] was holding the rifle, pacing, and still shouting the
> aforementioned obscenities.

(Resp. Ex. F.)

This Court's review of the summary confirms that it is fair and accurate, when viewing the evidence in the light most favorable to the verdict. The Court adds to the above that Twehous testified that he observed the initial confrontation when he was sitting "just off" the patio of a neighbor's apartment, that before Petitioner left to retrieve the rifle, he (Twehous) observed that Petitioner "had about half his body into [Hudson's] apartment," and that he then observed the rest of the incident through a window and peephole in his neighbor's apartment. *Id*. at 213-32.

The evidence also showed that the four police officers who had arrived at the scene took Petitioner from the scene to the hospital for treatment of the knife wound that required some stitches. In closing argument, the prosecutor referred to Petitioner as "tattoo man" in arguing that Hudson's version of events portraying Petitioner as the aggressor was more credible than Petitioner's story that Hudson provoked the violence:

> Adrian did not provoke this. The defendant went to his door. Even [Petitioner] says Adrian tried to break this off by closing the door. And Adrian tried to cut this off by closing the door again. He didn't get in. When a door slams in your face, the conversation is over. Then he attacked Adrian. They want you to believe that Adrian attacked him. You saw the size of Adrian. You got tattoo man here . . .

(Resp. Ex. A at 343-44.) The record establishes that Petitioner had 30 tattoos. Defense counsel's objection was overruled.

Also during closing argument, the prosecutor stated, without objection by defense counsel, that the case was about race, that Petitioner was a "narrow minded little bigot," that when bigotry is tolerated, "everyone is in danger," and that the jury needed to send a message that bigotry would not be tolerated in their community. The prosecutor also

invoked the memory of Martin Luther King and stated that although it was "an exaggeration to say that this was a 21st century attempted lynching," Petitioner was filled with hate and terrorized Hudson and his family. *Id.* at 350. The word "nigger" was uttered approximately 50 times during the trial.

**Direct Appeal**

On direct appeal, Petitioner argued that the trial court erred in overruling his motion for judgment of acquittal on the first-degree assault charge because there was insufficient evidence that Petitioner took a substantial step toward attempting to kill or cause serious physical injury to Hudson; erred in overruling Petitioner's objection to the prosecutor's reference to Petitioner as "tattoo man" during closing argument; and erred in failing to declare a mistrial *sua sponte* when the prosecutor made the above noted racially-related comments and repeated Petitioner's use of the term "nigger," all of which, according to Petitioner, improperly incited the jury's emotions against Petitioner and personalized the argument to the jury. (Resp. Ex. C.)

On March 25, 2008, the Missouri Court of Appeals affirmed Petitioner's conviction and sentence. The court concluded that the evidence was sufficient to support the conviction for first-degree assault, as "[p]etitioner's actions, accompanied by his relentless and unambiguous threats, were sufficient to lead a reasonable trier of fact to conclude that he was taking substantial steps and would have persisted, but for the police, until he successfully entered the apartment and caused serious injury to its inhabitants."

(Resp. Ex. F at 3.)  The court distinguished *Verweire v. Moore*, 211 S.W.3d 89 (Mo. banc 2006), upon which Petitioner relied, as in that case the defendant retreated on his own without having attempted to shoot the pistol with which he threatened the victim.

The appellate court dismissed the claims regarding the prosecutor referring to Petitioner as "tattoo man" and making racially-related comments during argument, because Petitioner failed to preserve the points for appellate review either by not objecting at trial (racially-related comments) or by not including the issue ("tattoo man") in Petitioner's motion for a new trial.  The appellate court believed that the claim that the trial court should have declared a mistrial *sua sponte* due to the prosecutor referring to Petitioner's use of the word "nigger" was also procedurally defaulted, because Petitioner only asked that the term be stricken from the information, and did not object at trial.  Reviewing this claim for plain error, the appellate court found none, as "[a]ny prejudice Petitioner may have suffered from the admission of his own epithets at trial can be attributed to the very probativeness of the challenged evidence.  A defendant is not entitled to exclude evidence merely because it damages his case."  *Id*. at 6.

**State Postconviction Proceedings**

In a motion for state postconviction relief, Petitioner claimed that defense counsel was ineffective for, among other things, failing to (1) object to the prosecutor's race-related statements in closing argument; (2) preserve for appellate review the objection to the prosecutor referring to Petitioner as "tattoo man," (3) object to the prosecutor's repeated reference to Petitioner using the term "nigger" and failing to move for a mistrial after repeated references to the word; (4) object to and preserve for appellate review the

6

prosecutor's attempts to portray the crimes as racially-motivated hate crimes; and (5) investigate the crime scene adequately, as such an investigation would have provided evidence that, among other things, Twehous would have been unable to observe the events as he had described them, especially in September when the trees were full of leaves, evidence which could have been used to impeach Twehous's testimony.  (Resp. Ex. I at 4-26.)

An evidentiary hearing was held on the postconviction motion on August 27, 2009, at which an investigator testified that in December 2008, he went to the crime scene, and that the investigator could not see inside the doorway of Hudson's apartment from the patio on which Twehous testified he was sitting and observed part of the criminal activity.  (Resp. Ex. H at 10.)  The investigator admitted that he did not know the substance of Twehous's trial testimony.

Defense counsel testified by deposition in lieu of live testimony.  When questioned about his decision not to object to the race-related statements made by the prosecutor during closing argument, defense counsel stated that he was not too concerned about the statements because sentencing was going to be handled by the court, not the jury, and that he did not believe the prosecutor was "making much headway with those [arguments] anyway."  Defense counsel testified that, as a matter of trial strategy, he did not want to object and call attention to the statements as that would only serve to highlight them and "play into [the prosecutor's] strategy."  (Resp. Ex. J at 7-9.)

Defense counsel testified that he went to the crime scene but did not recall whether he stood where Twehous said he was during the commission of the crimes.  Defense

counsel stated that he did not include the "tattoo man" comment in Petitioner's motion for a new trial because he did not think it rose to the level of warranting a new trial. Defense counsel testified that he did not object to the prosecutor's use of the word "nigger" as defense counsel did not believe there was any way to exclude the fact that Petitioner had used the word during the crimes, and believed that use of the word by others at trial prior to Petitioner testifying might have the strategic benefit of desensitizing the word. Counsel stated that he objected to inclusion of the word in the amended information because he did not want it in the jury instructions, and that was different from not objecting to use of the word at trial. *Id*. at 10.

After the hearing, on that same day (August 27, 2009), the motion court issued an order taking the matter under submission and granting counsel 60 days "to provide" proposed findings of facts and conclusions of law. (Resp. Ex. at 32.) On October 2, 2009, before Petitioner submitted proposed findings and conclusions, the court issued its decision. The motion court rejected Petitioner's claim that defense counsel was ineffective in failing to object to the race-related statements in the prosecutor's closing argument. The court found that "the racial nature of the case cannot be ignored," that it was Petitioner who "injected race into this case by his own action," and that the prosecutor's challenged arguments were "valid inferences from the evidence." Moreover, according to the court, defense counsel presented valid strategic reasons for not objecting. *Id*. at 34.

The motion court held that the objection at trial to the term "tattoo man" was properly overruled, as the reference "was a reasonable inference" from the fact that

Petitioner had 30 tattoos, and "at worst," was "harmless hyperbole." The motion court concluded that it was "inconceivable" that the jury convicted Petitioner based on the prosecutor's use of the term, and the court agreed with defense counsel's assessment of the futility of raising this matter in a motion for a new trial. *Id.* at 35. In rejecting Petitioner's claim that counsel was ineffective in not objecting to the prosecutor's use of the word "nigger" in presenting the state's case, the motion court held that use of the word was relevant to show Petitioner's intent to commit first-degree assault and was part of the *res gestae* of the crime. The court noted that its decision at the start of trial to remove the objectionable word from the amended indictment was not intended to indicate the court's willingness to exclude as evidence words said by Petitioner during commission of the crimes.

Lastly, the motion court denied Petitioner's claim that defense counsel was ineffective in failing to determine, upon visiting the crime scene, that Twehous could not have observed the crimes as he described them from his location. The court found that Petitioner had failed to present credible evidence of this alleged impossibility, as the investigator who had testified at the evidentiary hearing did not investigate the view Twehous would have had from the grass next to the patio (as opposed to from the patio itself), from the apartment window, or through the apartment peephole. *Id.* at 39-40.

The motion court's "Findings of Fact, Conclusions of Law and Judgment" consists of seven and a half typed pages, with two handwritten corrections initialed by the judge. On October 26, 2009, Petitioner moved to vacate the motion court's judgment so that the court could consider Petitioner's proposed findings and conclusions that he attached to

the motion.  On November 20, 2009, the motion court summarily denied the motion.  *Id.* at 75.

On appeal from the denial of postconviction relief, Petitioner reasserted his claims of ineffective assistance of defense counsel and also asserted that the motion court denied him due process in adopting the state's findings of fact and conclusions of law verbatim and denying Petitioner the opportunity to submit his own proposed findings and conclusions.  Petitioner asserted that the state's proposed findings and conclusions were submitted to the motion court without notice or service upon Petitioner.   (Resp. Ex. K.)

In affirming the motion court, the state appellate court held that the motion court did not err in finding that defense counsel acted within the bounds of reasonable trial strategy in failing to object to the prosecutor's race-related statements in closing argument, as well as in not objecting to the prosecutor's use of the racial slur at trial.  The appellate court held that by not presenting evidence at the evidentiary hearing to support the claim that defense counsel was ineffective for not objecting to the prosecutor's statements in opening argument characterizing the crimes as hate crimes, Petitioner had abandoned the claim for consideration on appeal.  The appellate court found that Petitioner's investigator's testimony lacked sufficient probative value to find that defense counsel was ineffective in his investigation of the crime scene, because the investigator had no knowledge of the evidence presented at trial as to where Twehous was when he observed the altercation between Petitioner and Hudson.  (Resp. Ex. N at 16-17.)

The court recognized the concern raised by Petitioner regarding the motion court issuing its judgment before Petitioner submitted his proposed findings and conclusion.

But the appellate court held that the motion court "did not violate any rule of law or commit any error" in this regard. The appellate court then stated that there was nothing in the record to support Petitioner's assertion that the motion court adopted the State's proposed findings and conclusions as its own, and that even if there were such evidence, such a practice was acceptable in Missouri as the record was void of evidence that the motion court failed to thoughtfully and carefully consider any proposed findings and conclusions filed with the court. *Id*. at 19-20.

## DISCUSSION

Rather than consider Respondent's procedural default argument with respect to Petitioner's claims concerning the "tattoo man" comment and defense counsel's failure to object to the prosecutor's characterization of the crimes as hate crimes, the Court will address these claims on the merits, along with Petitioner's other claims. *See, e.g., Nance v. Norris*, 392 F.3d 284, 291 (8th Cir. 2004) (stating that a court may choose to by-pass a procedural default question and proceed to the merits) (citing *Stephens v. Norris*, 83 F.3d 223, 224 (8th Cir. 1996)).

## Standard of Review

Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective death Penalty Act ("AEDPA") provides that application for a writ of habeas corpus cannot be granted unless the state court's adjudication

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent but arrives at the opposite result. *Strong v. Roper*, 737 F.3d 506, 510 (8th Cir. 2013); *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner "has the burden of rebutting this presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1); *see also Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014).

## Sufficiency of the Evidence

Petitioner asserts that his due process rights were violated because there was insufficient evidence from which the jury could have found that Petitioner took a substantial step toward the completion of the offense of attempting to kill or cause serious injury to someone, as required for a conviction of Class B first-degree assault under Missouri law. Petitioner asserts that a review of the trial transcript indicates that he never pointed the gun at Hudson nor did Hudson ever see Petitioner with the gun in his hand.

Furthermore, Hudson testified that Petitioner never stated to him that he was coming into his apartment but kept inviting him outside to fight.

The due process clause prohibits the conviction of an accused "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In the § 2254 setting, the federal court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Evans v. Luebbers*, 371 F.3d 438, 441 (8th Cir. 2004). The scope of habeas review of such a claim is "extremely limited." *Skillicorn v. Luebbers*, 475 F.3d 965, 977 (8th Cir. 2007). This means that when "a reviewing court [is] 'faced with a record of historical facts that supports conflicting inferences [the reviewing court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326)). This Court may grant habeas relief only if the Missouri Court of Appeals' determination that the evidence satisfied the sufficiency of evidence standard under *Jackson* was "'both incorrect and unreasonable.'" *Garrison v. Burt*, 637 F.3d 849, 855 (8th Cir. 2011); *see also Webb v. Steele*, No. 4:10 CV 758 RWS; 2014 WL 684006, at *13 (E.D. Mo. Feb. 21, 2014).

A person commits first-degree assault under Missouri law when, among other things, "he attempts to kill or knowingly causes or attempts to cause serious physical

injury to another person." Mo. Rev. Stat. §565.050.1. An attempt under state law is "when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." *Id*. §564.011.1. A "substantial step" is "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *Id.*

Here, the Missouri Court of Appeals reasonably determined that, viewing the evidence in the light most favorable to the verdict, there was sufficient evidence to support Petitioner's conviction of first-degree assault. The evidence at trial demonstrated that Petitioner left the scene of the initial encounter with Hudson, returned with a loaded assault rifle, took the safety clip off, approached Hudson's apartment, and tried to break the door down. During that entire time, he was yelling that he was going to kill Hudson. He stopped his rampage only after the four police officers arrived on the scene. A rational trier of fact could have determined based on these facts that Petitioner was breaking down the door in order to kill or cause serious physical injury to Hudson, and that Petitioner's actions were a substantial step towards that end. *See In re J R N*, 687 S.W.2d 655, 656 (Mo. Ct. App. 1985) (holding that evidence that the defendant entered a hotel carrying a lug wrench and announced that he was there to assault the manager but was stopped by a police officer was sufficient to show intent to cause serious physical injury to support the conviction for Class B first-degree assault).

## Prosecutor's Tattoo and Race-related Comments

A prosecutor's argument violates due process if it infects the trial with unfairness. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). It "is not enough that the prosecutor's

remarks were undesirable or even universally condemned. 'The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181 (holding that although the prosecutor's closing argument was improper in commenting that the death penalty would be the only guarantee against a future similar act and in referring to the defendant as an "animal" who should not be out of his cell without a leash did not deprive the defendant of a fair trial, as the comments did not manipulate the evidence or implicate specific rights of the accused such as the right to remain silent, and in view of the heavy evidence against the defendant) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974)). A prosecutor's challenged statements must be viewed in the context of the entire trial. *Culkin v. Purkett*, 45 F.3d 1229, 1235 (8th Cir. 1995). To be entitled to relief, a habeas petitioner must show that there is a reasonable probability that absent the alleged improper comments, the verdict probably would have been different. *Roberts v. Bowersox*, 137 F.3d 1062, 1066 (8th Cir. 1998).

Furthermore, under the AEDPA standard of review, Petitioner must show that the state appellate court's adjudication of this claim was an unreasonable application of existing United States Supreme Court law. This combination of the due process standard and the AEDPA standard of review, together with a federal habeas court's "less reliable vantage point for gauging the impact of closing argument on the overall fairness of the trial," results in an "exceptionally limited review" of this issue. *Sublett v. Dormire*, 217 F.3d 598, 600 (8th Cir. 2000) (citation omitted).

Here the prosecutor's reference to Petitioner as "tattoo man" was in the context of an argument comparing the physical size of Hudson and Petitioner, an argument that was based on facts known to the jury by physical observation. Although the label "tattoo man" could be seen as prejudicial, it was not so prejudicial as to infect the trial with unfairness. Similarly, the state appellate court reasonably determined that the prosecutor referring to Petitioner as a "bigot" did not constitute a due process violation.

The prosecutor did highlight the racial nature of the crimes, and did play on the jury's emotions not to tolerate racism. As a general matter, statements in opening or closing arguments that appeal to emotion, and "against a rational decision by the jury," are improper because they are "contrary to a fair proceeding." *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006). But the question remains whether the jury verdict reasonably could have been affected by the improper comments. *Graves v. Ault*, 614 F.3d 501, 507 (8th Cir. 2010). Here, considering the record as a whole, including the cumulative effect of all the challenged comments and the strength of the properly admitted evidence of Petitioner's guilt, the Court concludes that the Missouri Supreme Court's resolution of this matter against Petitioner was not based on "an unreasonable determination of the facts in light of the evidence" or an unreasonable application of "clearly established Federal law." 28 U.S.C. § 2254(d)(1) and (2). The Court remains convinced that the verdict was based on the evidence and not on any improper factors.

**Reference to Petitioner's Use of the Word "Nigger"**

As the state appellate court found, this objectionable word was mentioned at trial, both by the prosecutor in opening argument, and repeatedly in the presentation of

evidence, because Petitioner used that word during commission of the crimes. *Cf. United States v. Littrell*, 439 F.3d 875, 882-83 (8th Cir. 2006) (holding that facially improper comments were nonetheless proper because they made as part of a review of the evidence, demonstrating that the comment did not amount to personal vouching by the prosecutor). The jury was entitled to consider Petitioner's threats, and the possible racial animus behind the crimes, in evaluating his guilt.

## Assistance of Defense Counsel

Petitioner claims that defense counsel was constitutionally ineffective in failing to object to the race-related comments by the prosecutor in opening and closing argument, and to use of the word "nigger" by the prosecutor and throughout the trial; and in failing to investigate the crime scene adequately. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that counsel's performance was deficient, and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As the Eighth Circuit recently explained:

> The first prong requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." The second prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*White v. Dingle*, 757 F.3d 750, 752-53 (8th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687, 694). There is a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Tunstall v. Hopkins*, 306 F.3d 601, 606 (8th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689).

Because both § 2254(d) and *Strickland* are deferential, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011); *see also Williams v. Roper,* 695 F.3d at 831-832. In light of the above discussion about the prosecutor's comments in opening and closing argument, and the prevalence of the word "nigger" in the facts underlying Petitioner's trial, Petitioner's claims that that defense counsel was ineffective for failing to object to the comments and use of the word in question fail, because he cannot show that there is a reasonable probability that had counsel objected, the result of the proceeding would have been different. Furthermore, the state courts' findings that the failure to object was reasonable strategy on defense counsel's part is supported by review of the trial transcript and the transcript of the postconviction evidentiary hearing.

With respect to Petitioner's claim that defense counsel was ineffective for failing to discover, in his investigation of the crime scene, that Twehous could not have observed the crimes as he described, the Court's review of the trial transcript and the testimony of Petitioner's investigator at the postconviction hearing, leaves little doubt that the state appellate court's rejection of this claim was factually and legally reasonable. Although this Court may take issue with aspects of the state courts' reasoning – namely, distinguishing between "just off" and "on" the patio, and relying on that fact that the investigator did not know the substance of Twehous's testimony – the Court agrees with the state courts that Petitioner failed to present credible evidence of the alleged impossibility of Twehous having observed the events in accordance with his testimony.

This undermines the claim that defense counsel was ineffective in his investigation of the crime scene.

## PostConviction Court's Procedure in Issuing its Judgment

Petitioner's last claim for habeas relief is twofold: he challenges on due process grounds both the motion court's issuance of its judgment before the time had run for Petitioner to submit proposed findings and conclusions and before he had done so, and as well as the motion court's alleged verbatim adoption of the state's proposed findings and conclusions. The Court concludes that neither aspect of the claim is cognizable in this federal habeas action. *See Kenley v. Bowersox*, 228 F.3d 934, 938 (8th Cir. 2000) (holding that habeas petitioner's claim that he did not receive adequate notice and opportunity to be heard before the state postconviction court adopted the state's proposed findings and conclusions verbatim was not cognizable in a federal habeas petition because an attack on the procedure employed in the state postconviction proceeding does not test the legality of a prisoner's sentence).

Even if either aspect of claim were cognizable, the Court concludes that it would fail on the merits. The Court agrees with Respondent that the second part of the claim fails because Petitioner has not rebutted the presumption of correctness that applies to the state appellate court's factual determination that there was no evidence to support the claim. The only evidence Petitioner relied on in state court, and relies on here, is the two handwritten corrections in the motion court's order noted above. This does not suffice. Petitioner had ample opportunity to present a credible factual basis for this part of his claim but failed to do so. Moreover, as the state appellate court noted, there is no internal

evidence suggesting that the motion court may not have carefully considered the findings and conclusions it issued. And there is no evidence that the motion court did not consider Petitioner's proposed findings and conclusions before denying Petitioner's October 26, 2009 motion to vacate, 25 days after the motion was filed.

With respect to the first part of the claim, there was no due process violation because Petitioner had a full evidentiary hearing on his postconviction claims. Although his expectation, based on an order of the motion court, that he could file posthearing proposed findings and conclusions, was thwarted by the motion court, this did not deprive him of process to which he was due under the federal constitution. *See id.*

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. Furthermore, the Court does not believe that reasonable jurists might find the Court=s assessment of Petitioner=s claims for habeas relief debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. ' 2254(d)(2). *See Miller-El v. Cockrell*, 123 S. Ct. 1029, 1040 (2003) (standard for issuing a Certificate of Appealability) (quoting *Slack v. Petitioner*, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED t**hat the petition of Bryan McDaniel for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall not be issued in this case.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2014.